UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MORAN TOWING CORP. and            \*
PETROLEUM TRANSPORT CORP.,        \*
      Plaintiffs,                \*
                                  \*
v.                                \*   Civil Action No. 99-12509-JLT
                                  \*
GIRASOL MARITIMA SA, INC.; KYO    \*
KUTO SHIPPING CO.; M/V BRILLIANT  \*
ACE; and UNITED STATES OF AMERICA,\*
      Defendants.                \*

MEMORANDUM

April  11 , 2002

TAURO, J.,

Two merchant vessels, heading in opposite directions in the Cape Cod Canal on August 16, 1999, passed each other at 12:30 A.M. This case concerns the consequences of that passing. One vessel continued its journey and the other ran aground.

Plaintiff Moran Towing Corp. ("Moran") owns the tug M/V MARY TURECAMO, and Plaintiff Petroleum Transport Corp. ("Petroleum") owns the barge FLORIDA.[1] Plaintiffs sue Defendants Girasol Maritima SA and Kyo Kuto Shipping Co. Ltd., owners and/or operators of the M/V BRILLIANT ACE, *in personam*, and the M/V BRILLIANT ACE, *in rem* (collectively the "BRILLIANT ACE Defendants");[2] and the United States of America, controller of the Cape

---

[1] Compl. ¶¶ 2-3.

[2] Girasol Maritima and Kyo Kuto Answer ¶ 4.

Cod Canal.

Plaintiffs allege that in August 1999, while the MARY TURECAMO was towing the FLORIDA in push-formation eastbound through the Cape Cod Canal, the BRILLIANT ACE approached and passed the vessels at an excessive speed. The MARY TURECAMO consequently ran aground, and both the MARY TURECAMO and the FLORIDA were damaged.

Plaintiffs claim that, at the time of the accident, the BRILLIANT ACE was exceeding set speed limits within the Canal. Plaintiffs also contend that the Government breached its duty to safely and properly regulate vessel traffic through the Canal by allowing the BRILLIANT ACE to exceed speed limits and by allowing the BRILLIANT ACE and the MARY TURECAMO to simultaneously transit the Canal. Plaintiffs claim that the Government knew or should have known that hydrodynamic forces between the vessels would cause the type of accident that occurred.

## FINDINGS OF FACT

On the night of August 16, 1999, Sam Rowe captained the tug MARY TURECAMO. Captain Rowe had more than thirty years maritime experience – three of them with the MARY TURECAMO and barge FLORIDA, and nine years towing oil barges up and down the east coast as Captain of one of MARY TURECAMO's sister ships.[3]

On the night of the incident, the MARY TURECAMO was pushing the barge FLORIDA, with the tug pulled tight into the barge's forty-five foot notch with two-inch thick steel cables.[4] The barge FLORIDA was laden with 110,000 gross barrels of number-six heating oil for power

---

[3](Tr. Day 1 at 49:3-6; 51:2-17).

[4](Id. at 52:1-3).

2

plants,[5] and she had an unmanned draft of 26 feet.[6] Together, the tug and barge combination was almost 500 feet long, and is hereinafter collectively referred to as the MARY TURECAMO.[7]

The MARY TURECAMO departed Eagle Point, New Jersey, on August 14, 1999, destined for Cousin's Island, Maine, via a west to east navigation of the Canal.[8] On August 16, 1999, the MARY TURECAMO sailed towards Buzzards Bay, directly southwest of the Canal.

The pilot of the BRILLIANT ACE ("ACE") was Arthur Lemke, who has been a pilot since 1983.[9] He has an "unlimited license," which allows him to sail any ship upon any seas, and he is specifically licensed to pilot the Cape Cod Canal by both the state and federal governments.[10] In his long career, Pilot Lemke has piloted the Canal in excess of 2,000 times, and up to half of these voyages involved a meeting with another vessel heading in the opposite direction.[11]

The ACE is a "pure car carrier," and is 180 meters long with a summer draft of 28'11".[12] With its 13,230 horsepower engines, the vessel is capable of 17.0 knots, and can carry 4,865

---

[5](Trial Ex. 154, Lowe Dep. at 23:6-7; Tr. Day 1 at 54:20 - 55:14).

[6](Trial Ex. 142, "Florida Particulars"). Captain Rowe explained that the term "draft" refers to the measurement of maximum load at a given temperature. "Unmanned draft" indicates the load line when the crew is not aboard the vessel. (Tr. Day 1 at 56:1-15).

[7](Tr. Day 1 at 65:17).

[8](Ex. 22, Turecamo Voyage Plan; Tr. Day 1 at 57:9-11).

[9](Tr. Day 2 at 138:7).

[10](Tr. Day 2 at 141:21 - 142:6).

[11](Tr. Day 2 at 144:13 - 145:16).

[12]See supra note 6.

3

cars.[13] The ACE departed Boston Harbor on August 16, 1999, heading for Port Elizabeth, New Jersey, via an east to west transit of the Canal.[14]

The Cape Cod Canal extends from Cape Cod Bay to Cleveland Ledge Light, Buzzards Bay, Massachusetts.[15] The "Land Cut" has a bottom width of approximately 480 feet, and is 8.1 miles long. There are "strong tidal currents" in the Canal, and the Army Corp of Engineers warns navigators of possible "bank suction" and "bank cushion," which may affect the handling of vessels.[16]

The United States Army Corp of Engineers employs marine traffic controllers to monitor traffic through the canal, including the speed of vessels, measured as "speed over the ground."[17] Speed over the ground is the speed of a vessel between two geographic points, while speed through the water accounts for current.[18] For example, assuming a four knot fair current,[19] a vessel with a speed over the ground of eight knots would have a speed through the water of four knots.

The Canal marine traffic controllers monitor speed by tracking the time it takes vessels to

---

[13](Trial Ex. 27).

[14](Trial Ex. 29, Brilliant Ace Voyage Plan, p. 2).

[15](Trial Ex. 127, "Cape Cod Canal Navigation Regulation and General Information" (the "Red Book"), p. 13).

[16](Id.).

[17](Tr. Day 2 at 11:16 - 12:21).

[18](Tr. Day 2 at 12:7-14).

[19]A vessel proceeding with the current is said to have a "fair current," whereas a vessel proceeding against the current has a "head current." (Tr. Day 1 66:23-15; 53:22-24).

transit the canal. By mandating the minimum amount of time for vessels to transit the canal, the system allows a pilot to increase or decrease speed at various points, as he may deem necessary to control the vessel.[20] As vessels pass by Station 35 at the east end of the Canal and Station 388 at the west end, radar and cameras monitor speed over the ground.[21] A computerized monitoring system marks vessels on the controller's radar, allowing the controller to monitor speed, course, estimated time for arrival, and possible meeting points for vessels approaching each other.[22] If a vessel's speed is excessive, an alarm will sound. According to Robert Orman, the Controller on duty on August 16, 1999, and Frederic Danhauser, the Controller who relieved Orman at 23:30, no alarm sounded that night.[23] The minimum running times for the land cut between Stations 35 and 288 are: 60 minutes with a head tide, 30 minutes with a fair tide, and 45 minutes with a slack tide.[24]

Captain Rowe initially contacted the Canal Control Tower at 20:15, when the MARY TURECAMO passed the "BB Buoy."[25] Rowe again contacted the controllers at Buoy 11, located south of Cleveland Ledge, and informed the controller of his location.[26] Rowe testified at trial

---

[20](Tr. Day 2 at 12:18-21).

[21](Tr. Day 2 at 13:13-16).

[22](Tr. Day 2 at 15:2-16).

[23](Tr. Day 2 at 16:8-25, 62:5, 72:11).

[24](Trial Ex. 127, Red Book, p. 6).

[25](Trial Ex. 20, MARY TURECAMO Daily Log); (Tr. Day 1 at 60).

[26](Tr. Day 1 at 62).

that the controller instructed him to "bring her on, you've got nothing west of you."[27] While neither Rowe nor Lemke asked for a one way Canal, they were not required to do so.[28]

Pilot Lemke called Control at some point before he boarded the BRILLIANT ACE at 23:00 in Cape Cod Bay.[29] Before entering the Canal, Lemke was aware that the MARY TURECAMO intended to transit the Canal from west to east.[30] Once aboard, Lemke ordered the ship's engines to full ahead speed, which the Pilot Card showed to be 12 knots through the water, and proceeded toward the Canal.[31] The ACE passed the east end jetties (the eastern entrance of the Canal) at 23:17, and proceeded through the Canal against a four knot current.[32] From the time the ACE entered the Canal until after the meeting with the MARY TURECAMO, the ACE's engine was going full ahead.[33] Lemke did nothing to slow his speed at any point during the ACE's transit of the Canal.[34] At trial, Lemke testified, "I don't like to reduce speed when I'm proceeding at a safe speed."[35] He did not consider slowing down during the meeting, nor did he

---

[27](Tr. Day 1 at 62:22 - 63:13).

[28](Tr. Day 2 at 47:9-11).

[29](Tr. Day 2 at 158:8).

[30](Tr. Day 2 at 154).

[31](Tr. Day 2 at 160; Tr. Day 3 at 47).

[32](Tr. Day 3 at 55:4-6, 56:6-13, 67:13-16).

[33](Tr. Day 3 at 52:25).

[34](Tr. Day 2 at 69:18-23).

[35](Tr. Day 2 at 178:6-7).

notify the MARY TURECAMO that he was not going to do so.[36]

Captain Rowe and the MARY TURECAMO were at Hog Island when he learned that the ACE was proceeding into the Canal at the east end jetties.[37] Rowe was not concerned about meeting a deep draft vessel in the Canal, because he expected both vessels to slow down.[38] Rowe, whose vessel proceeded with the current, was "making bare steerageway," which means that he was running slightly faster than the current in order to maintain control.[39]

The intended meeting place was Herring Run, west of the High Wires.[40] The meeting spot was the best place for the two vessels because the Canal is relatively wide and straight at that location.[41] Captain Rowe and Lemke were in radio contact immediately before the meeting, and Rowe informed Lemke that the MARY TURECAMO was difficult to handle, given the fair tide.[42] The MARY TURECAMO was traveling at approximately 5.7 knots through the water, and the ACE's speed was roughly 11 knots through the water.[43] The vessels approached each other port to port.[44]

---

[36](Tr. Day 4 at 17:21-23; Day 3 at 50:23 - 51:10).

[37](Tr. Day 1 at 68:11-12, 69:10-14).

[38](Tr. Day 1 at 70:22 - 71:6).

[39](Tr. Day 1 at 71:11-16).

[40](Tr. Day 1 at 74:11 - 75:1).

[41](Tr. Day 1 at 76:6-13).

[42](Tr. Day 1 at 76:1-19).

[43](Tr. Day 3 at 159-162).

[44](Tr. Day 1 at 75:25).

As the two vessels drew near, the hydrodynamic forces pushed the bow of the MARY TURECAMO away from the ACE, towards the south bank. Rowe compensated for this effect by applying a slight left rudder, but the forces increased as the boats came together midship. Rowe then forced the rudder hard right, as the boats began to suck together, and he threw the throttles full ahead.[45] As the boats passed, Captain Rowe radioed the ACE, "Way to kick her up, Ace," indicating his perception that Lemke was proceeding at an excessive speed.[46]

After the boats passed, the suction caused the MARY TURECAMO to sheer,[47] sending the bow into the north bank of the canal.[48] When Captain Rowe saw that the MARY TURECAMO was about to strike the bank, he ordered the engines reversed and "smoked the clutches."[49] He ordered Able Bodied Seaman Leslie McDermot to drop the FLORIDA's 6-8,000 pound anchor in order to protect the bow from further damage and prevent an oil spill.[50] In Rowe's opinion, dropping the anchor any sooner would have caused the bow to strike the bank head on, and the situation would have been much worse.[51]

Despite Captain Rowe's efforts, the port bow struck land, and after putting the 500-foot vessel in reverse, the tug's rudders and wheels slammed into the south bank. The vessel was then out of power, and Rowe radioed the controllers that the "Ace turn [sic] me around crossways here,

---

[45](Tr. Day 1 at 77-78).

[46](Tr. Day 1 at 84:7-9).

[47]To "sheer" is to swerve, or deviate from a course. (See Tr. Day 3 at 150:25 - 151:7).

[48](Tr. Day 1 at 79:20 - 80:19).

[49](Tr. Day 1 at 80:22 - 81:13).

[50](Tr. Day 1 at 90:1 - 91:1).

[51](Tr. Day 1 at 91:16-25).

hold everything up."[52]

Controller Danhauser testified that it is prudent for both deep draft vessels to slow down when transiting the Canal.[53] The ship traveling with the current, here the MARY TURECAMO, has the right of way, because it is harder to slow down and steer.[54]

At trial, experts discussed the hydrodynamic forces involved in meetings such as this. Plaintiffs' expert was John Nicolas Newman, Emeritus Professor of Naval Architecture at MIT, specializing in marine hydrodynamics.[55] Newman explained that when two vessels meet, they experience various, nonuniform pressure fields, resulting in forces and moments. A lateral force is "a tendency to push in a certain direction. . . . A turning moment is a little bit more intangible, but it is the tendency to rotate a vessel about the vertical axis; in other words, pushing the bow in one direction and pushing the stern in the opposite direction."[56] As the vessels come together, the force is initially a repulsion, then an attraction as the ships come abreast, and finally, as the ships pull past each other, a repulsion.[57] In terms of the turning moment, "during the initial portion of the meeting encounter, the bows are pushed away from each other, so it is a bow-out phenomenon."[58] The moments then pull the bows toward each other, and when the ships are abreast, the moment is again

---

[52](Tr. Day 1 at 86:14-17).

[53](Tr. Day 2 at 112:15 - 113:1).

[54](Tr. Day 2 at 95:22 - 97:13).

[55](Trial Ex. 88, p.4).

[56](Tr. Day 3 at 128:2-10).

[57](Tr. Day 3 at 130:21 - 131:22).

[58](Tr. Day 3 at 133:1-3).

bow-out. The final phase is again bow-in.[59]

The most significant variable in determining the magnitude of these hydrodynamic forces is speed,[60] and "clearly the Brilliant Ace impacted the Mary Turecamo, Florida much more than vice versa," "[b]ecause the Brilliant Ace was going much faster through the water."[61] In addition, the ACE was exceeding the above ground speed limit by approximately 25 percent.[62] Professor Newman's report also indicated that the fair current adversely affected the handling of the MARY TURECAMO.[63] Newman ultimately concluded that interaction forces between the MARY TURECAMO and the ACE caused the MARY TURECAMO to sheer to port and strike the bank of the Canal, and a twenty-five percent reduction in the speed of the ACE would have reduced the interaction forces by almost one-half.[64]

Defendant's expert, William Day, agreed that if the ACE had reduced its speed, it could have minimized the disturbances in the water.[65] He noted that ship to ship interaction had the greatest effect on maneuverability, and the ship with the greater speed has the greater hydrodynamic influence.[66] He agreed that, "assuming a 3 ½ knot current, the differential in speed through the water between the BRILLIANT ACE and the MARY T was 10 ½ to 11 for the BRILLIANT ACE

---

[59](Tr. Day 3 at 133:6-12).

[60](Tr. Day 3 at 136:6-7).

[61](Tr. Day 3 at 140:3-7).

[62](Tr. Day 3 at 165:24 - 166:2)

[63](Trial Ex. 88, p.7)

[64](Id. at 17).

[65](Tr. Day 5 at 95:22-23).

[66](Tr. Day 5 at 106).

and about 5.7 for the MARY T. Almost two to one . . . ."[67]

## CONCLUSIONS OF LAW

A.   The Remaining Claim Against the Government

In an earlier Memorandum, this court granted the Government summary judgment on Plaintiffs' claim that the Government negligently allowed the two vessels to simultaneously transit the canal. Applying the discretionary-function exception to the Federal Tort Claims Act, this court concluded that the Government's decision to permit the vessels to simultaneously transit the canal was discretionary.[68] For a full treatment of the legal and factual landscape surrounding Plaintiffs' claims against the Government, this court refers the reader to that published decision.[69]

Finding a material dispute over whether the means existed for the Government to enforce the speed regulations, however, this court denied the Government's summary judgment motion on Plaintiffs' claim that the Government failed to regulate the BRILLIANT ACE's speed through the Canal. "The regulations require the [Government] to enforce the rules it prescribes. How the [Government] enforces its rules clearly is discretionary, but that means are in place to enforce the rules is not."[70]

The two marine traffic controllers, Robert Orman and Fred Danhauser, testified that they

---

[67](Tr. Day 5 at 115:4-9)

[68]Moran Towing Corp. v. Girasol Maritima SA, Inc., 146 F. Supp.2d 87, 92 (2001).

[69]Id.

[70]Id. at 92.

11

utilize cameras, computers, a logbook, and a radar system to track a vessel's speed.[71] If a vessel reaches 13 or 14 knots, a speed alarm sounds.[72] It is clear from the testimony, however, that traffic control in the Canal is laissez-faire at best, with verbal or written citations extremely rare.[73] Although controllers may make "suggestions" to pilots and captains, they do not issue orders,[74] and they only admonish vessels for excessive wake or obvious and egregious speeding.[75]

Nevertheless, the testimony demonstrates that a means, albeit imperfect, existed to enforce the Canal's speed regulations. As a matter of law, it was within the marine traffic controllers' discretion to do so sparingly.[76] This court, therefore, finds in favor of the Government on Plaintiffs' remaining claim against it.

### B. The BRILLIANT ACE Defendants

#### 1. Applicable Law

In DiMillo v. Sheepscot Pilots, Inc., the First Circuit noted that "[a] ship's master has considerable discretion, but it is not unbridled. Reasonable prudence is reasonably to be expected."[77] "[N]otwithstanding the captain's discretion, an action will lie if he makes a decision which nautical experience and good seamanship would condemn as inexpedient and unjustifiable at

---

[71](Tr. Day 2 at 13:22 - 14:8; 61:4-14 ).

[72](Tr. Day 2 at 16:15 ).

[73](Tr. Day 2 at 12:15-20; 14:9-18).

[74](Tr. Day 2 at 22:10-18).

[75](Tr. Day 2 at 21:13-19).

[76]See Moran, 146 F. Supp.2d at 92.

[77]DiMillo v. Sheepscot Pilots, Inc., 870 F.2d 746, 748 (1st Cir. 1989).

the time and under the circumstances."[78] The master has a duty to exercise "reasonable care and maritime skill . . . consistent with knowledge and circumstance."[79]

Congress established statutory standards of navigation in the Inland Navigational Rules Act ("INRA"), commonly referred to as the "Rules of the Road."[80] Relevant here are Rules 2 ("Responsibility"),[81] 5 ("Look-out"),[82] and 6 ("Safe Speed").[83] In addition, federal regulations

---

[78]Id. (internal quotation and citations omitted).

[79]Id. at 749 (internal quotation and citations omitted).

[80]33 U.S.C. §§ 2001-2038.

[81]33 U.S.C. § 2002:
    (a) Exoneration
    Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.
    (b) Departure from rules when necessary to avoid immediate danger
    In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

[82]33 U.S.C. § 2005:
    Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision.

[83]33 U.S.C. § 2006:
    Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

    In determining a safe speed the following factors shall be among those taken into account:
        (a) By all vessels:
            (i) the state of visibility;
            (ii) the traffic density including concentration of fishing vessels or any other vessels;
            (iii) the maneuverability of the vessel with special reference to

impose certain obligations on vessels in the Cape Cod Canal.[84] Specifically, federal regulations establish speed limits for vessels in the Canal, expressed in terms of "minimum running times." All types of vessels in the Canal must observe these minimum running times. No vessel may transit through the canal in an amount of time shorter than those prescribed.[85] In addition to adhering to the minimum running times, vessels proceeding against the current must yield the right of way to vessels proceeding with the current.[86]

---

        stopping distance and turning ability in the prevailing conditions;
        (iv) at night the presence of background light such as from shore lights or from back scatter of her own lights;
        (v) the state of wind, sea, and current, and the proximity of navigational hazards;
        (vi) the draft in relation to the available depth of water.
  (b) Additionally, by vessels with operational radar:
        (i) the characteristics, efficiency and limitations of the radar equipment;
        (ii) any constraints imposed by the radar range scale in use;
        (iii) the effect on radar detection of the sea state, weather, and other sources of interference;
        (iv) the possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;
        (v) the number, location, and movement of vessels detected by radar; and
        (vi) the more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

[84] See 33 C.F.R. § 207.20.

[85] See 33 C.F.R. § 207(j), stating in relevant part:
    The minimum running time for the land cut between the East Mooring Basin (Station 35) and the Administration Office in Buzzards Bay (Station 388) is prescribed as follows:
        Head Tide–60 minutes
        Fair Tide–30 minutes
        Slack Tide–45 minutes

[86] See 33 C.F.R. § 207.20(k)(4).

2. Application

This court finds that Pilot Lemke was negligent in refusing to reduce the through the water speed of the BRILLIANT ACE. As discussed above, Lemke never changed the "full ahead" engine order that he gave before entering the Canal and, at the time of the incident, his above ground speed exceeded the limit by twenty-five percent. While he could have slowed down and still maintained control of his vessel, he chose to proceed at full ahead engine speed, causing the significant hydrodynamic disturbances which resulted in the grounding of the MARY TURECAMO.

Lemke's failure to proceed at a safe speed or yield to the MARY TURECAMO's right of way constituted negligence. The BRILLIANT ACE Defendants, therefore, are liable for damages sustained by the MARY TURECAMO and the FLORIDA.

The First Circuit has noted that "liability for damages in maritime collision 'is to be allocated among the parties proportionately to the comparative degree of their fault.'"[87] According to the Defendants, Plaintiff failed to post a proper look-out, thereby violating Rule 5. In addition, Defendants argue that the MARY TURECAMO was handling poorly, and that Captain Rowe should have requested a one way Canal. All of this, Defendants claim, constituted negligence on the part of Plaintiffs. The evidence does not support these arguments.

While Captain Rowe or Pilot Lemke could have asked for a one way canal, as discussed above, they were under no obligation to do so, despite the handling difficulty attendant to a fair current. The MARY TURECAMO/FLORIDA flotilla proceeded at a prudent speed on a clear, calm evening in an illuminated Canal, with its Captain and a deckhand standing watch at the tug's helm. Put simply, no actions of the Plaintiffs dilute the liability of the ACE.

---

[87] LoVuolo v. Gunning, 925 F.2d 22, 28 (1st Cir. 1991) (quoting United States v. Reliable Transfer, 421 U.S. 397 (1975)).

3.   Damages

"It is fundamental in the law of damages that the injured party is entitled to compensation for the loss sustained. Where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good position pecuniarily as if his property had not been destroyed."[88]

Plaintiffs seek $1,160,488.66 in damages, plus prejudgment interest.[89] Defendants agree that the tug and barge were damaged, but conclude that the total repairs, including towing, oil cleanup, and survey/inspection costs, should total no more than $543,612.78.[90]

Plaintiffs assert that returning the tug MARY TURECAMO and the barge FLORIDA to their precasualty condition cost $665,284.07.[91] Defendants argue that Plaintiffs inflated the cost by including various improvements to the vessels. According to Defendants, this unrelated "owners' work" amounted to nearly $130,000.

At trial, David Beardsley, Vice President of Moran's Construction and Repair Department, testified regarding the repairs made on the MARY TURECAMO and the FLORIDA. While some "owners' work" was done, including fender repairs and towing cable renewal, Plaintiffs deducted the cost of such work from the claim.[92] This court, therefore, finds that Plaintiffs' demand for $665,284.07 for costs associated with returning the MARY TURECAMO and FLORIDA to their

---

[88] Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155 (1925).

[89] See Pls.' Proposed Findings of Fact and Rulings of Law ¶ 211.

[90] See Defs.' Post-Trial Memorandum 36; Parties' Stipulation, Tr. Day 3 at 90.

[91] See Pls.' Trial Memorandum 26.

[92] (Tr. Day 3 at 91:12 - 92:24).

precasualty condition is fair and reasonable.

Plaintiffs also demand $104,806.40, representing the lost value of the FLORIDA's cargo of oil.[93] After the incident, Plaintiffs were forced to sell the oil in an emergency distress sale to Canal Electric, a power plant located near the banks of the Canal. The sale resulted in a $104,806.40 loss to Coastal Sales Trading Company, the owner of the oil, who was under contract with Moran.[94] Moran subsequently paid Coastal the full $104,806.40, and this court finds Plaintiffs' demand to be reimbursed for that expenditure to be fair and reasonable.

Plaintiffs further demand $390,398.25, representing lost income resulting from the grounding of the vessels.[95] At the time of the incident, Plaintiffs were on "time charter" to Penn Maritime Company at a rate of $11,000 per day.[96] After the grounding, both vessels were inoperable for 35.94 days, and Moran was unable to provide alternate vessels to Penn Maritime under the time charter.[97] Because the only savings to Moran during the 35.94 days was freight commission, this court finds that Plaintiffs' demand of $390,398.25, representing loss of income, is fair and reasonable.

Finally, Plaintiffs claim that they are entitled to prejudgment interest. As noted by the Supreme Court in <u>Milwaukee v. Cement Div., National Gypsum Co.</u>,[98] prejudgment interest is traditionally awarded in admiralty cases absent special circumstances, including undue delay in

---

[93] <u>See</u> Pls.' Trial Memorandum 28.

[94] <u>See</u> Pls.' Proposed Findings of Fact and Rulings of Law ¶¶ 196-198.

[95] <u>See</u> Pls.' Trial Memorandum 28.

[96] (Tr. Day 1 at 173:8 - 174:11).

[97] (Tr. Day 1 at 178:7-8; 177:15).

[98] 515 U.S. 189 (1995).

prosecuting the lawsuit.[99]  Prejudgment interest is intended "as compensation for the use of funds to which the plaintiff was ultimately judged entitled, but which the defendant had the use of prior to judgment."[100]  Because there is no evidence of undue delay or other peculiar circumstances in this case, this court awards prejudgment interest to Plaintiffs, at a rate of 12%, from August 16, 1999.

## CONCLUSION

This court finds that: (1) Defendant United States was not negligent, and is not liable to Plaintiffs for damage to the barge FLORIDA and the tug MARY TURECAMO, and (2) the BRILLIANT ACE Defendants were negligent and the proximate cause of the damage to the barge FLORIDA and tug MARY TURECAMO, and are therefore jointly and severally liable in the amount of $1,160,488.66, plus prejudgment interest from August 16, 1999 through the date of entry of judgment, at a rate of 12.0% per annum.

AN ORDER WILL ISSUE.

_____
United States District Judge

---

[99]See id. at 196.

[100]Borges v. Our Lady of the Sea Corp., 935 F.2d 436, 444 (1st Cir. 1991).